## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| **Plaintiff,** | **CRIMINAL ACTION NO.** |
| | **1:20-CR-85-MLB-CCB** |
| **v.** | |
| **LAZAVIER WILLIAMS,** | |
| **Defendant.** | |

## FINAL REPORT AND RECOMMENDATION

Defendant Lazavier Williams is charged with receiving a firearm at a time when he knew he was under a felony indictment for possession with intent to distribute marijuana, in violation of 18 U.S.C. §§ 922(n) and 924(a)(1)(D) (Count One); possession of a stolen firearm, in violation of 18 U.S.C. §§ 922(j) and 924(a)(2) (Count Two); and distributing a mixture and substance containing a detectable amount of methamphetamine, in violation of 21 U.S.C. §§ 841(a) and 841(b)(1)(C) (Count Three). (Doc. 1). The matter is before the Court for consideration of Defendant's motion to suppress statements, (Doc. 28), motion for the production of the names and other identifying information of any confidential informants, (Doc. 29), and motion to dismiss Count One of the indictment, (Doc. 30). For the reasons set forth below, the motion for the production of the names of confidential

informants is **DENIED**, and I **RECOMMEND** that the motion to suppress and the motion to dismiss be **DENIED**.

## I.   Facts

The Court held an evidentiary hearing on October 1, 2020, at which ATF Senior Special Agent Allan McLeod testified. (Doc. 41). These facts are drawn from his testimony and the exhibit introduced at that hearing.

Defendant was indicted on February 18, 2020. (Doc. 1). He was subsequently arrested on March 9, 2020, and he was transported to the Atlanta City Detention Center (ACDC), where he spent the night. (Doc. 41 at 7, 9). Defendant was not questioned at all on March 9, nor did he ask for an attorney. *Id.* at 8–10. On March 10, 2020, Special Agent McLeod and ATF Special Agent James Nash went to ACDC to transport Defendant to the federal courthouse for his initial appearance. *Id.* at 10. McLeod told Defendant that they were going to take him to the United States Marshals' facility and "explained the process" to him—that he would be assigned an attorney and would meet with a probation officer. *Id.* at 11. Defendant was handcuffed, placed in the agents' vehicle, and they drove for seven or eight minutes to the courthouse. *Id.* at 10–11, 23. During the drive, the agents asked Defendant biographical questions that were necessary to complete a Marshals Service intake form. *Id.* at 13, 23–25, 27.

After the agents arrived at the courthouse parking deck, they pulled into a parking spot so that Defendant could use one of their phones to make a call. *Id.* at 14, 26. After Defendant finished his call, Special Agent McLeod told him that he would like to ask him some questions about the investigation, specifically about sources of firearms and drugs. *Id.* at 13–14, 26. McLeod told Defendant that McLeod would be willing to answer questions that Defendant might have, and that because it would be a back-and-forth question-and-answer, McLeod would have to read him *Miranda* rights from a card. *Id.* at 13, 26. However, before McLeod could read him his rights, Defendant spoke for about 12 seconds, during which time he told the agent that he did not have any big sources and that he (the Defendant) was just a middleman. (Doc. 41 at 13; Gov. Exh. 1 at 00:00–00:12).[1]

McLeod acknowledged what Defendant said and told him that "before I ask you any actual questions about them, I am going to say that you have the right to remain silent, anything you say can be used against you in a court of law, you have the right to consult with an attorney before questioning and to have one present during questioning. If you can't afford a lawyer, one will be appointed to represent you free of charge prior to any questioning." (Gov. Exh. 1 at 00:13–00:35). The

---

[1] The agents recorded the conversation using one of their phones, and the recording begins with those 12 seconds of Defendant speaking (which, according to the McLeod, followed McLeod's statement about wanting to talk to Defendant and needing to read him *Miranda* rights). (Doc. 41 at 13; Gov. Exh. 1).

agent asked Defendant if he understood his rights, and Defendant said "yes, sir." *Id.* at 00:36–00:37. McLeod then asked Defendant if he was willing to waive his rights and talk. *Id.* at 00:38–00:40. Defendant said something unintelligible, at which point the agent asked "are you?" *Id.* at 00:40–00:44. The conversation was then briefly interrupted when someone approached the vehicle, seemingly to ask about why it was parked where it was. (*Id.* at 00:44–01:07; Doc. 41 at 18). The agent then said, "Mr. Williams, are you willing to waive these rights and talk with us?" (Gov. Exh. 1 at 01:08–01:09). Defendant answered, "ah, yes. I just, I just want to like, like, get like how can I, I just really need help getting like a bond or something." *Id.* at 01:10–01:16. The agent explained that the fact that he had been cooperative, did not try to flee, and did not try to fight would all go in his favor and that the only thing really going against him was a probation violation warrant—and that his attorney might be able to handle that. *Id.* at 01:17–01:42. For the remainder of the conversation, Defendant and the agents discussed facts related to the investigation as well as those that might impact whether Defendant would get a bond. *Id.* at 01:43–12:28.

The agents did not present Defendant with a written *Miranda* waiver form. (Doc. 41 at 15). Nor are there facts from the hearing to suggest that the agents threatened Defendant in any manner or that Defendant was in any way incapacitated or did not understand what the agents told him. *See id.* at 11–12, 16,

20–21, 27. Defendant never asked to stop the interview, he never asked for a lawyer, and neither of the agents made any promises to Defendant—about a bond or anything else. *Id.* at 20–21.

## II.    Defendant's Motion to Dismiss Count One of the Indictment

Count One of the indictment charges a violation of 18 U.S.C. § 922(n), which makes it a crime "for any person who is under indictment for a crime punishable by imprisonment for a term exceeding one year to ship or transport in interstate or foreign commerce any firearm or ammunition or receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce." Defendant raises a purely legal challenge to this count—he maintains that he was not "under indictment" on October 2, 2019, which is when the indictment alleges that he received a firearm. (Doc. 45 at 2–5). He also argues that the statute is unconstitutionally vague and that the rule of lenity favors his interpretation. *Id.* at 6–7.

### A.    Defendant Was Under Indictment

On October 5, 2018, Defendant was charged in a three-count felony indictment in the Superior Court of Fulton County with possession of marijuana with the intent to distribute, possession of marijuana in a drug-free commercial zone, and possession of a firearm during the commission of a felony. (Doc. 47-1 at 6–8). Approximately two months later, he entered a negotiated plea to those

5

counts and he was sentenced, under Georgia's First Offender Act, to seven years—the first two of which were to be served on probation and the remaining five would be suspended under the First Offender Act. (Doc. 47-1). The written judgment contains this admonition:

> *The Defendant consenting hereto, it is the judgment of the Court that no judgment of guilt be imposed at this time but that further proceedings are deferred* and the Defendant is hereby sentenced to confinement at such institution as the Commissioner of the State Department of Corrections or the Court may direct, with the period of confinement to be computed as provided by law.

> *Upon violation of the terms of probation*, upon conviction for another crime during the period of probation, or upon the Court's determination that the Defendant is or was not eligible for sentencing under the First Offender Act or for Conditional Discharge, *the Court may enter an adjudication of guilt and proceed to sentence the Defendant to the maximum sentence as provided by law.*

> *Upon fulfillment of the terms of this sentence*, or upon release of the Defendant by the Court prior to the termination of this sentence, *the Defendant shall stand discharged of said offense without court adjudication of guilt and shall be completely exonerated of guilt of said offense charged.*

(Doc. 47-1 at 4) (emphasis added). The question, then, is whether Defendant was "under indictment" after he entered his plea and while he was serving the probationary portion of his First Offender Act sentence. Because Defendant was never adjudicated guilty of the crimes in Fulton County, and because that case

was, in effect, suspended while he served his time on probation, Defendant was under indictment in October of 2019, and his motion to dismiss should be denied.

To start, the Eleventh Circuit does not appear to have addressed whether someone serving a Georgia First Offender Act sentence is "under indictment" for purposes of § 922(n). The issue has come up in this court, however, and Judge Fuller previously addressed it in a Report and Recommendation that was subsequently adopted by Judge Story. *United States v. Bonds*, No. 2:16-CR-34-WCO-JCF, 2017 WL 2991804 (N.D. Ga. Mar. 10, 2017), *adopted by* 2017 WL 2991465 (N.D. Ga. July 13, 2017). The legal issue here is the same as was considered in *Bonds*, the arguments made the by parties appear nearly identical, the cases Judge Fuller relied on and distinguished are the ones the parties now argue to the Court, and I am altogether persuaded by the analysis and resolution in *Bonds*. This R&R, therefore, largely tracks the one issued in *Bonds*.

Federal law defines an "indictment" as "an indictment or information in any court under which a crime punishable by imprisonment for a term exceeding one year may be prosecuted." 18 U.S.C. § 921(a)(14). Defendant argues that at the time alleged in the federal indictment, he had pled guilty to the state crimes and was already more than a year into serving his sentence and, therefore, was no longer "under indictment" in state court. (Doc. 45 at 3). The question of whether Defendant was "under indictment" turns on the ins and outs of the Georgia First

Offender Act, which is where the analysis begins. *See, e.g., United States v. Saiz*, 797 F.3d 853, 855–56 (10th Cir. 2015) (examining New Mexico law to discern the effect of a "conditional discharge order" under that state's jurisprudence).

"The series of statutes known as the First Offender Act deal with sentencing options for a person not previously convicted of a felony." *Davis v. State*, 496 S.E.2d 699, 702 (Ga. 1998). "Such an individual is permitted to enter a plea of guilty or nolo contendere, to serve the probationary sentence or term of imprisonment handed down, and to be discharged without court adjudication of guilt and without a record of a criminal conviction." *Id.* (citing O.C.G.A. §§ 42-8-60, 42-8-62(a)). "A first offender's guilty plea does not constitute a 'conviction' as that term is defined in the Criminal Code of Georgia.…" *Id.*; *see also Williams v. State*, 804 S.E.2d 398, 401 (Ga. 2017) (citing *Davis* for the proposition that a guilty plea under the First Offender Act does not constitute a conviction). Indeed, the Georgia statute in effect in 2018 (it has changed slightly since then) allowed a court to, upon a guilty plea, "and before an adjudication of guilt, without entering a judgment of guilt…*defer further proceedings* and" place the defendant on probation or sentence him to prison. O.C.G.A. § 42-8-60(a) (emphasis added). After that, one of two things could happen: if the defendant violated the terms of the probation or was convicted of another crime during the period of his sentence, the court could "enter an adjudication of guilt" and sentence the defendant as provided by state

8

law. O.C.G.A. § 42-8-60(d). Or, if the defendant performed well and completed his probation (or the court released him early), the defendant would be "exonerated of guilt and shall stand discharged as a matter of law." O.C.G.A. §§ 42-8-60(d), (e).

The critical point is that, in a First Offender Act case, the entry of a guilty plea does not result in an adjudication of guilt—it simply starts the process of allowing the defendant to serve his sentence, with the matter only later ending in either exoneration if the defendant performs well or adjudication of guilt if he does not. "Under the first offender statute, the case has, in effect, been suspended during the period of probation." *Davis v. State*, 537 S.E.2d 663, 665 (Ga. 2000) (internal quotation marks omitted). And because a First Offender Act defendant stands neither convicted nor discharged during the period of probation, the necessary implication is that he therefore remains subject to the indictment—in terms of § 922(n), he is "under indictment." *See Bonds*, 2017 WL 2991804, at *3 ("The undersigned therefore finds that Defendant was 'under indictment' for purposes of 18 U.S.C. § 922(n) when he allegedly committed the federal firearms offense at issue here because he had not yet been adjudicated guilty on the charged state offense, nor had the charge been discharged or dismissed.").

This conclusion is entirely consistent with the language of Defendant's judgment—which made clear that no judgment of guilt was imposed "at this time but that further proceedings are deferred." (Doc. 47-1 at 4) (also noting that the

9

court may enter an adjudication of guilt if Defendant violated the terms of his probation or was convicted of another crime or, alternatively, that Defendant would "stand discharged" upon completion of the terms of the sentence or early release from those terms). It is also consistent with case law from other circuits. *See, e.g.*, *Saiz*, 797 F.3d at 855–56 (finding that a defendant was "under indictment" in New Mexico, after pleading guilty under a conditional discharge order, because state law provided that such a plea results neither in an adjudication of guilt nor a dismissal of the charges—like in Georgia, the charges simply "remain in suspension until the defendant completes his term of probation"); *United States v. Valentine*, 401 F.3d 609, 615 (5th Cir. 2005) (finding that a defendant was "under indictment" in Texas pursuant to a "deferred adjudication" that did not result in an adjudication of guilt or a conviction, but rather left the defendant with a pending charge).

Defendant cites to *United States v. Hill*, 210 F.3d 881 (8th Cir. 2000). There the defendant pled guilty to a crime in Missouri, and the proceedings were held in abeyance—at the expiration of the defendant's time on probation, the state court could fully discharge the defendant without a conviction or could sentence him if he violated the terms of his probation. *Id.* at 883. The Eighth Circuit noted that the primary purpose of an indictment under Missouri law is to give general notice to the defendant of the charge against him and, by the defendant pleading guilty, the

purpose of the indictment was "satisfied." *Id.* at 884 ("Its primary function satisfied, the indictment served no further purpose and was thus extinguished."). The court held (over the dissent of one judge) that the defendant was therefore not "under indictment" for purposes of the Missouri charges. *Id.*

I see no meaningful distinction between the statutory scheme in Missouri that the Eighth Circuit considered in *Hill*, the New Mexico scheme that the Tenth Circuit considered in *Saiz*, and the Georgia First Offender Act at issue here. And I find persuasive the Tenth Circuit's explanation for why that court disagreed with *Hill*:

> Although it is true that an indictment's purpose is to inform a defendant of the charges against him, we find no support for the proposition that a defendant is no longer subject to an indictment after he pleads guilty and before he is adjudged guilty. To the extent that a conditional discharge puts off a finding of guilt, it simply prolongs the life of the indictment. A holding to the contrary would be incongruous with the requirement that charges are only dismissed when the defendant completes the probationary period, as well as the fact that the defendant is never convicted unless he violates the terms of release. If the indictment dissipated at the time of the guilty plea, there would be no more charges to dismiss and no chance of a future conviction. The statutory scheme exists precisely to give a defendant a chance to avoid a finding of guilt, while preserving the threat posed by the indictment until the completion of probation.

*Saiz*, 797 F.3d at 857 (internal quotation marks, citations, and footnotes omitted); *see also Bonds*, 2017 WL 2991804, at *4–5 (agreeing with the reasoning of *Saiz* and finding "the court's analysis in *Hill* unpersuasive").

11

Finally, Defendant argues that a defendant in Georgia may immediately appeal "from his conviction upon imposition of first-offender status (a 'sentence' if you will), notwithstanding the absence of a formal and final adjudication of guilt." *Dean v. State*, 338 S.E.2d 711, 712 (Ga. Ct. App. 1985) (internal quotation marks omitted). Defendant argues that the ability to appeal shows that neither the case nor the indictment remain pending. (Doc. 45 at 4). But the right to appeal recognized in *Dean* is simply the right to appeal from the imposition of a First Offender sentence—it says nothing about whether the charges remain pending. Indeed, as *Dean* makes clear, a defendant may also later seek to appeal any revocation of the First-Offender probation. *Dean*, 338 S.E.2d at 712–13. The court in *Saiz* rejected a similar argument, noting that the right to appeal the initial conditional discharge order "reaffirms that a conditional discharge order does not dispose of the case to the fullest extent possible." 797 F.3d at 858. "The fact that defendants may appeal to avoid the inherent hardships of conditional discharge is consistent with the fact that they are still subject to charges that have not yet been adjudicated." *Id. Dean* itself makes clear that the imposition of a First Offender sentence (even though subject to immediate appeal) does not end the proceedings, and it does not support Defendant's argument that the right to immediately appeal demonstrates that the indictment is no longer pending. Such

12

a finding would be flatly inconsistent with the very language of Defendant's judgment, which explicitly states that "further proceedings are deferred." (Doc. 47-1 at 4); *see also Saiz*, 797 F.3d at 858 (rejecting a similar ability-to-appeal argument in light of the fact that the language of the conditional discharge order stated that "'further proceedings will be deferred'").

For the reasons stated above, I recommend that Defendant's motion to dismiss, premised on the argument that he was not "under indictment" at the time of the federal gun offense, be denied.

### B.     Section 922(n) is not Unconstitutionally Vague

Defendant argues that, even if he were "under indictment," § 922(n) is unconstitutionally vague because no ordinary person would understand that he or she is still "under indictment" years "or even decades after entering a guilty plea" under the First Offender Act. (Doc. 45 at 6).

"'Vagueness' is an outgrowth of the Fifth Amendment's Due Process Clause." *United States v. Wayerski*, 624 F.3d 1342, 1347 (11th Cir. 2010). "It encompasses notions of fair warning such that people of common intellect may understand a statute's prohibitions and need not guess at its meaning." *Id.* "A criminal statute will violate due process if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits or

13

it authorizes or even encourages arbitrary and discriminatory enforcement." *Id.* (internal quotation marks omitted). "There is a strong presumption that statutes passed by Congress are valid." *Id.*

The first step in a vagueness analysis is to look at the language of the statute. *Id.* If the plain language of the statute "sets forth clearly perceived boundaries, our inquiry is ended." *Id.* Section 922(n) makes it a crime "for any person who is under indictment for a crime punishable by imprisonment for a term exceeding one year to ship or transport in interstate or foreign commerce any firearm or ammunition or receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce." And the statute explains that "an indictment or information in any court under which a crime punishable by imprisonment for a term exceeding one year may be prosecuted." 18 U.S.C. § 921(a)(14). "The plain language of that statute thus sets forth clearly perceived boundaries, i.e., a person under indictment or information is prohibited from shipping for receiving a firearm or ammunition shipped or transported in interstate or foreign commerce." *Bonds*, 2017 WL 2991804, at *6 (internal quotation marks omitted).

The defendant in *Bonds* made the same argument Defendant makes here— that no ordinary person would understand that they are still under indictment years after entering a guilty plea under the First Offender Act. *Id.* And I agree with

14

Judge Fuller's take on that argument:

> As discussed above, Georgia law provides that a guilty plea under the First Offender Act is not an adjudication of guilt or a conviction, and therefore the offense remains pending until the defendant either satisfactorily completes probation or the court terminates the probation, at which time the charge is dismissed, or the court later adjudicates the defendant guilty due to a violation of the terms of his probation or commission of a new offense. Thus, ordinary people of common intelligence would understand that by pleading guilty pursuant to Georgia'[s] First Offender Act, they remain under indictment until the charge was dismissed or an adjudication of guilt occurred.

2017 WL 2991804, at *6. Section 922(n) is not unconstitutionally vague.

Finally, Defendant argues that the "rule of lenity requires that any ambiguity in a criminal statute be resolved in the defendant's behalf" and that the "ambiguities in the portion of § 922(n) are legion." (Doc. 45 at 6–7).

"The rule of lenity holds that a law must speak in language that is clear and definite if it is to render something a crime." *United States v. Phifer*, 909 F.3d 372, 383 (11th Cir. 2018) (internal quotation marks omitted). It holds "that if at the end of the interpretive road — having exhausted the applicable semantic and contextual canons of interpretation, and thus seized everything from which aid can be derived — meaningful doubt remains about the application of a criminal statute to a defendant's conduct, then the doubt should be resolved in the defendant's favor." *United States v. Caniff*, 955 F.3d 1183, 1191 (11th Cir. 2020) (internal

quotation marks, alteration, and citation omitted). "The simple existence of some statutory ambiguity, however, is not sufficient to warrant application of that rule, for most statutes are ambiguous to some degree." *United States v. Puentes*, 803 F.3d 597, 610 (11th Cir. 2015) (internal quotation marks omitted). "Rather, the rule of lenity applies only if there is a grievous ambiguity or uncertainty in the statute." *Id.* (internal quotation marks omitted).

Defendant simply asserts that the ambiguities in the statute are "legion" and that the rule of lenity therefore applies. (Doc. 45 at 7). The undersigned disagrees. To the extent that there is any ambiguity in the statute—and none is apparent—it certainly is not "grievous." There is no ambiguity in how the statute defines "under indictment," nor, as applied here, about whether Defendant was "under indictment" for purposes of his First Offender Act plea in the Superior Court of Fulton County. *See Bonds*, 2017 WL 2991804, at *7 (holding that "there is no 'grievous' ambiguity in the term 'under indictment' or, as discussed above, whether Defendant was 'under indictment' under Georgia law"). For all the reasons stated above, it is **RECOMMENDED** that Defendant's motion to dismiss Count One of the indictment, (Doc. 30), be **DENIED**.

16

III.   **Defendant's Motions to Suppress Statements**

Defendant argues that the entirety of the statement that he made to the agents while in their vehicle in the parking deck of the courthouse should be suppressed. (Doc. 44). Defendant breaks the statement into two parts—the 12 seconds before he was read his *Miranda* rights, and then everything he said after being read the warnings. *Id.* at 3. As to the first 12 seconds, Defendant argues that he was subject to interrogation when Agent McLeod told him the general topics that he wanted to discuss and that the agent "should have known that by telling Mr. Williams that he wanted to ask him about sources of firearms and drugs [that] Mr. Williams would reasonably respond by making incriminating statements on that topic." *Id.* at 4. As for the post-warning statements, Defendant maintains that he requested a lawyer when he told the agent that he "really need[ed] help getting like a bond or something," (Gov. Exh. 1 at 01:10–01:16), and that therefore the questioning should have immediately stopped, (Doc. 44 at 4–7). The Government argues that, as to the initial 12 seconds, the agent's statement about the topics he would like to discuss did not amount to interrogation. (Doc. 48 at 7–9). As to the remainder of the conversation, the Government maintains that Defendant knowingly and voluntarily waived his rights and that his statement about wanting a bond should not be viewed as a request for an attorney. *Id.* at 9–13.

### A. The Initial 12 Seconds

The Fifth Amendment requires courts to "exclude from evidence any incriminating statements an individual makes before being warned of his rights to remain silent and to obtain counsel." *United States v. Luna-Encinas*, 603 F.3d 876, 880 (11th Cir. 2010). The entitlement to *Miranda* warnings, however, "attaches only when custodial interrogation begins." *Id.* (internal quotation marks omitted). Interrogation, for purposes of *Miranda*, includes "express questioning" as well as "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 300–01 (1980) (footnote omitted). "Because the underlying purpose of the *Miranda* rule is to dispel compulsion, the relevant inquiry in deciding whether words or actions constitute interrogation focuses primarily upon the perceptions of the suspect, rather than the intent of the police." *United States v. Hicks*, 546 F. Supp. 2d 1378, 1381 (N.D. Ga. 2008) (internal quotation marks omitted).

Here the parties do not dispute that Defendant was in custody. Nor does Defendant argue that he was subject (during the initial 12 seconds) to express questioning—he maintains only that Special Agent McLeod "should have known that by telling Mr. Williams that he wanted to ask him about sources of firearms and drugs [that] Mr. Williams would reasonably respond by making incriminating

statements on that topic." (Doc. 44 at 4). The Court disagrees. Again, to recap the conversation, McLeod told Defendant that he would like to ask him some questions about the investigation (specifically about sources of firearms and narcotics) but that he would have to first read Defendant his *Miranda* rights because it would be a back-and-forth conversation. (Doc. 41 at 13, 26). But before he could do so, Defendant told the agent that he did not have any big sources and that he (the Defendant) was just a middleman. (Doc. 41 at 13; Gov. Exh. 1 at 00:00–00:12). McLeod acknowledged Defendant's statement and then read him *Miranda* warnings. (Gov. Exh. 1 at 00:13–00:35).

Agent McLeod did nothing more than explain to Defendant what he wanted to discuss with him and make clear that, before they could have any conversation, the agent first had to read Defendant *Miranda* warnings. If anything, the agent gave Defendant more information than he was required to give—and allowed Defendant to make an especially informed decision about whether to waive his rights—by describing the topics about which the agent wanted to speak. *See United States v. Payne*, 954 F.2d 199, 203 (4th Cir. 1992) (rejecting an argument that telling a suspect that agents found a gun at his house amounted to interrogation and noting that "[i]nformation about the evidence against a suspect may also contribute to the intelligent exercise of his judgment regarding what course of conduct to follow"); *see also United States v. McKenzie*, 132 F. App'x 788, 790 (11th

19

Cir. 2005) (telling a suspect what drugs officers found in his room did not amount to the functional equivalent of interrogation). The agent should not have been expected to know that, by telling Defendant the topics he wanted to discuss and expressly stating that he had to first read *Miranda* warnings, Defendant would start talking before the agent did the very thing that he said had to come first—the *Miranda* warnings. [2] Nor did the agent employ "compelling influences" or "psychological ploys" to elicit a statement. *Arizona v. Mauro*, 481 U.S. 520, 529 (1987). All told, there are simply no facts from which to find that the agent engaged in the functional equivalent of interrogation when he told Defendant that he wished to speak with him about certain topics but that he had to first read him

---

[2] Defendant makes much of the fact that the agent did not specifically use the word "before" to make clear that *Miranda* had to come *before* the conversation. (Doc. 50 at 3). The agent testified that, "I'd like to ask some questions about the investigation but—and that I would also answer questions that he might have, but because it was a back-and-forth, that I would have to read him his Miranda rights from a card because there would be a back-and-forth question and answer." (Doc. 41 at 13). Even without using the word "before," the agent made clear that he would like to ask Defendant some questions and that he would have to read *Miranda*. Defendant argues that it would only "seem obvious to those within the legal profession that a rights advisement would need to occur before questioning." (Doc. 50 at 3). The Court simply disagrees. In very plain English, the agent told Defendant that he wanted to ask him some questions but that he would have to give him *Miranda* warnings. The Defendant then chose to start speaking before the agent could administer the proper *Miranda* admonition.

*Miranda* warnings. The initial 12 seconds of the conversation should not be suppressed.

**B.    The Remainder of the Conversation**

Defendant argues that the remainder of the conversation—that which occurred after the agent read Defendant his *Miranda* warnings—should be suppressed because Defendant requested a lawyer. (Doc. 44 at 4–7). The problem with this argument, however, is that Defendant did not request a lawyer.

The agent read Defendant his rights and then said, "Mr. Williams, are you willing to waive these rights and talk with us?" (Gov. Exh. 1 at 01:08–01:09). Defendant answered, "ah, yes. I just, I just want to like, like, get like how can I, I just really need help getting like a bond or something." *Id.* at 01:10–01:16. Defendant argues that his statement about needing help getting a bond was a request for an attorney. (Doc. 44 at 5).

By now it is beyond debate that, if a suspect requests a lawyer, further questioning must cease. *Davis v. United States*, 512 U.S. 452, 458 (1994) ("But if a suspect requests counsel at any time during the interview, he is not subject to further questioning until a lawyer has been made available or the suspect himself reinitiates conversation."). But the request for a lawyer must be unequivocal and unambiguous. *Id.* at 459 (holding that "if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the

circumstances would have understood only that the suspect *might* be invoking the right to counsel, our precedents do not require the cessation of questioning" (emphasis in original)). "Invocation of the *Miranda* right to counsel requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney." *United States v. Soleimani*, No. 1:18-cr-216-ELR-RGV, 2019 WL 7559295, at *19 (N.D. Ga. Sept. 25, 2019) (internal quotation marks omitted), *adopted by* 2019 WL 6002409 (N.D. Ga. Nov. 14, 2019). Even statements that directly mention an attorney or a lawyer—without being an unequivocal request for one—fall short. *See id.* at *20 (collecting cases where questions or statements such as, "maybe I should talk to a lawyer," "could I call my lawyer," "I might want to talk to an attorney," and "Do you think I need a lawyer?"—along with many others of the same type—were not deemed sufficiently unequivocal or unambiguous).

Against that backdrop, the Court cannot conclude that Defendant unambiguously and unequivocally requested a lawyer when he mentioned that he needed help getting a bond. His statement never even mentioned a lawyer, let alone unequivocally requested one. Defendant argues that the statement has to be read in context of the earlier conversation he had with the agents at the ACDC, where they told him that he would get a lawyer when he got to the courthouse. (Doc. 44 at 5–7). But even when read in that context, Defendant's statement is

22

nowhere close to the unambiguous and unequivocal invocation that must occur before questioning has to stop. Moreover, all the agents did at the ACDC was explain "the process"—that they were taking Defendant to the United States Marshals facility, that he would be assigned an attorney, and that he would meet with a probation officer—"just to give him an idea of how the day was going to go." (Doc. 41 at 11). Defendant argues from this context that, because he was not given an attorney when he and the agents arrived at the parking deck of the courthouse, his statement about a bond should be read as a request for an attorney. (Doc. 44 at 5–7; Doc. 50 at 5–6). Even that context does not make the statement an unambiguous request for an attorney—particularly given that it immediately followed the agent's statement that Defendant had "the right to consult with an attorney before questioning and to have one present during questioning." (Gov. Exh. 1 at 00:13–00:35). Simply put, a request for an attorney has to be clear, unambiguous, and unequivocal, and Defendant's statement about needing help to get a bond does not have the required degree of specificity or clarity. For the reasons stated above, Defendant's motion to suppress his statements, (Doc. 28), should be **DENIED**.[3]

---

[3] Nor, as Defendant argues, does the fact that Defendant was not provided with an attorney upon his arrival into the parking deck of the courthouse somehow make his waiver of the *Miranda* rights unknowing, involuntary, or unintelligent. (Doc. 44 at 6).

**IV.   Defendant's Motion for Production of the Name and Location of Confidential Informants**

Defendant seeks the names and identifying information of any confidential informants in the case. (Doc. 29). However, after the evidentiary hearing, the Government informed the Court that it intends to call both of the confidential informants it used in this investigation as witnesses at trial and will make them available to be interviewed (if they agree) prior to trial. Counsel for the Government further stated that she communicated this information to counsel for Defendant and that both of the attorneys agree that there is no need to further brief this motion in light of the Government's representation.

The Government has a limited privilege to withhold the identity of a confidential informant. *United States v. Flores*, 572 F.3d 1254, 1265 (11th Cir. 2009). "Where the disclosure of an informer's identity, or the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way." *Roviaro v. United States*, 353 U.S. 53, 60–61 (1957). "Courts analyzing *Roviaro*, however, have determined that the holdings of *Roviaro* do not apply when the informants will testify at trial." *United States v. Najera-Perez*, No. 1:12-CR-232-2-CAP, 2014 WL 888651, at *26 (N.D. Ga. Mar. 6, 2014). Because the Government has indicated that

it intends to call both confidential informants at trial, *Roviaro* does not require the Government to provide the names of those informants at this time, *see id.*, and Defendant's motion to compel such information, (Doc. 29), is **DENIED** without prejudice.

## V.     Conclusion

For the reasons stated above, the undersigned **RECOMMENDS** that Defendant's motions to dismiss Count I of the indictment and to suppress statements, (Docs. 28, 30), be **DENIED**.

Defendant's motion for the production of the names and identifying information of confidential informants, (Doc. 29), is **DENIED** without prejudice based on the Government's representation that it intends to call both such witnesses at trial.

**IT IS ORDERED** that, subject to a ruling by the District Judge on any objections to orders or recommendations of the undersigned Magistrate Judge, this case is **CERTIFIED READY FOR TRIAL**.

**IT IS SO RECOMMENDED,** this 11th day of February, 2020.

_____
CHRISTOPHER C. BLY
UNITED STATES MAGISTRATE JUDGE

25